**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| THEODORE HOKE,<br>on behalf of Plaintiff and the class members<br>described herein,<br><br>Plaintiff,<br><br>v.<br><br>DAVE BERNARD, doing business as Tomakowa, Pro Trust Group, River Funds, Midday Green, Eagle Wing Credit, Trois-Rivieres Solutions, Fast Green Direct, and Porch Light; FIRST NATIONS LENDERS AUTHORITY;<br>CONSTANTINE RADIOTIS;<br>NCR FINANCIAL SERVICES, INC.;<br>FINSANA, LLC;<br>MICHAEL D'AMBROSE;<br>WATERS LAW OFFICE, PLLC, doing business as WLO Payments;<br>and JOHN DOES 1-20,<br><br>Defendants. | ) |

**<u>COMPLAINT – CLASS ACTION</u>**

1. Plaintiff Theodore Hoke brings this action against (1) Dave Bernard, doing business as Tomakowa, Pro Trust Group, River Funds, Midday Green, Eagle Wing Credit, Trois-Rivieres Solutions, Fast Green Direct, and Porch Light; (2) First Nations Lenders Authority; (3) Constantine Radiotis; (4) NCR Financial Services, Inc.; (5) Finsana, LLC; (6) Michael D'Ambrose; (7) Waters Law Office, PLLC, doing business as WLO Payments; and (8) John Does 1-20 (collectively, "Defendants"), to secure redress for usurious and illegal loans (such as <u>Exhibit A</u>) made to Indiana residents.

2. Plaintiff seeks damages under the Indiana Uniform Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count II).

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 28 U.S.C. § 1332(d) (Class Action Fairness Act), 15 U.S.C. § 1692k (FDCPA), 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1337 (interstate commerce), and 28 U.S.C. § 1367 (supplemental jurisdiction).

4. On information and belief, there are more than 100 class members and the amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

5. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

6. Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

7. Article III is satisfied because actions for statutory damages and invalidation of loans

for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

8. Plaintiff is a citizen of Indiana and a resident of Greenwood, Indiana.

9. Defendant Dave Bernard is an individual who uses the address of 117 rue Nolka, Wolinak, Quebec, G0X 1B0, Canada. He does business as Tomakowa, Pro Trust Group, River Funds, Midday Green, Eagle Wing Credit, Trois-Rivieres Solutions, Fast Green Direct, and Porch Light. (Exhibit B)

10. Defendant First Nations Lenders Authority is or was until recently an entity which used the address of 1 Patton Road, P.O. Box 2012, Mohawk Territory of Kahnawake, Quebec, J0L 1B0, Canada.

11. Defendant Bernard purportedly made loans via the Internet using a number of websites, including www.ProTrustGroup.com.

12. The website www.ProTrustGroup.com and the following others are referred to herein as the "FNLA Websites":

a. www.greenfundsexpress.com.

b. www.arrowvalleyloans.com.

c. www.greenfundsgo.com.

d. www.arrowmountainfunding.com.

e. www.swiftdeerlending.com.

f. www.rapidarrowloans.com.

g. www.middaygreen.com.

h. www.fastgreendirect.com.

i. www.riverfundsgroup.com.

j. www.eaglewingfunds.com.

13. Defendant NCR Financial Services, Inc. is a corporation organized under the law of Delaware with a principal place of business of 4480 ch. de la Cote-de-Liesse, Suite 355, Mont-Royal, Quebec, H4N 2R1, Canada. Its registered agent and office is Corpomax, Inc., 2915 Ogletown Road, Newark, Delaware 19713.

14. Defendant Constantine Radiotis, also known as Constantinos Radiotis, is the president, secretary, and treasurer of NCR Financial Services, Inc., as well as its Director of Operations. He may be found at 4480 Chemin de la Côte-de-Liesse Suite 355, Mount Royal, Quebec, H4N 2R1, Canada.

15. Defendant Finsana, LLC is a limited liability company organized under Delaware law with a principal place of business of 4480 ch. de la Cote-de-Liesse, Suite 355, Mont-Royal, Quebec, H4N 2R1, Canada. Its registered agent and office is Corpomax, Inc., 2915 Ogletown Road, Newark, Delaware 19713.

16. Finsana, LLC describes itself as an "emerging global lender that specializes in catering to underserved and underbanked consumers since 2006."

17. Defendant Radiotis is the founder and chairman of Finsana, LLC.

18. The lending operations conducted via the FNLA Websites were in fact conducted by Defendants Radiotis, NCR Financial Services, Inc., and Finsana, LLC.

19. Radiotis has significant experience in online payday lending. He operates numerous lenders purportedly affiliated with American Indian tribes, several operating with legitimate state licenses from Utah or Missouri, and some outside of the United States.

20. On information and belief, all of these lenders use the same automated phone

system with the same computer-generated voice and containing the exact same error: "Thank you for calling (lender name). To ensure proper experience (SIC) all calls will be recorded for quality and compliance purposes."

21. On information and belief, all of these lenders use the same ACH Processor, WLO Payments.

22. The lending websites, despite supposedly being operated by different persons, are copies of one another. While minor details are changed, such as the font and text color, as well as the utilization of different stock photos, the text of the websites are almost verbatim duplicates of one another.

23. Each of the Radiotis-related lending websites contains the phrase "How much do you want to borrow?" followed by a slider that lets the user select an amount, with the slider set to $500 by default.

24. The website for every Radiotis-related lending entity contains a series of testimonials, with a circular picture of the consumer supposedly giving the testimonial.

25. The similarities between the websites, including shared call centers, ACH processor, and content, make clear that Radiotis, NCR Financial Services, Inc., and Finsana, LLC operate each online lender.

26. Defendant Michael D'Ambrose is an individual who may be found at 977 N. Oaklawn Ave., Ste. 103, Elmhurst, IL 60126-1045.

27. D'Ambrose is in charge of the enforcement of the loans made via the FNLA Websites via wage assignments.

28. D'Ambrose uses the address P.O. Box 959, Wood Dale, IL 60191, for such purposes.

29. Defendant Waters Law Office, PLLC, doing business as WLO Payments, processes ACH transactions for the lending operations.

30. WLO Payments is a Montana professional limited liability company with a principal

business address of 11 W. Main St., Suite 217, Belgrade, MT 59714.

31. WLO Payments's registered agent is Dustin Gahagan, 11 W. Main St., Suite 217, Belgrade, MT 59714

32. Defendants John Does 1-20 are other natural or artificial persons who participated in the Internet lending scheme complained of herein.

## LENDING SCHEME

33. Defendants made loans to residents of Indiana via the Internet. Funds were disbursed by means of ACH transfers to the borrowers' respective bank accounts in Indiana. Repayment was made via ACH transfers from the borrowers' respective bank accounts in Indiana.

34. The interest rates on the loans were many times the maximum permitted in Indiana.

35. To cover up and conceal the illegal lending activities, Defendants had the loans made using trade names registered in the province of Quebec, Canada.

36. The loan documents recited that each lender was a "sole Mohawk proprietorship and operates within the Mohawk Community of Kahnawake, which is a federally recognized First Nations entity and enjoys governmental sovereign immunity," under the auspices of the FNLA.

37. This is not true.

38. The Mohawk Council of Kahnawake never authorized the lending activities in question. (Exhibit C)

39. Defendant Bernard is either a Native American (referred to as First Nations in Canada) or lives on or near a reservation. He and several other persons were used to provide purported Native American cover for the lending operation, which was in fact operated by NCR Financial Services, Inc. and Finsana, LLC at the direction of Radiotis, with the assistance of WLO Payments and D'Ambrose.

40. FNLA was created in order to further the Native American cover, by purporting to

be a regulatory authority regulating the making of loans from Native American reservations in Quebec. In fact, it had no authority to do so. (Exhibit C)

41. The FNLA allowed anyone to apply for certification, charging US (not Canadian) $20,000 per year for a lender to become a "General Member," US$7,500 per year to become an "Affiliate Member" (e.g., companies which "assist" licensed lenders), and US$5,000 for "approved vendors."

42. The FNLA was nothing more than a front created by NCR Financial Services, Inc., Finsana, LLC, and their owners and investors, to convince the public that the FNLA is a "real" governing body and, somehow, has authority to regulate lending and interest rates between lenders in Mohawk territory and consumers in the United States.

43. Prior to about April 2025, the FNLA Websites purportedly operated as "subsidiary agencies" of the FNLA.

44. The FNLA in turn claimed to operate pursuant to a Charter of The First Nation Lenders' Authority (the "Charter") granted by the Mohawks of Kahnawake, which Charter supposedly granted the authority to regulate "short-term lending service businesses within First Nations Territories."

45. The FNLA then granted licenses to each of the FNLA Websites which licenses were available via a link on each website so that any consumer accessing the website would believe the lender to be legitimately licensed by the Mohawks of Kahnawake.

46. However, no such charter was ever recognized by the Council, or any other legitimate governing authority. (Exhibit C)

47. Defendants' loan agreements contain a choice-of-law provision indicating the laws of the Mohawk govern. There is no such law. (Exhibit C)

48. Under Canadian federal law, a loan with an interest rate greater than 60% per annum is a criminal offense, with no exception for loans made by persons claiming affiliation with a First Nation. (Section 347 of the Criminal Code of Canada)

49. The IP address for the server hosting GreenFundsExpress.com, one of the FNLA websites, is 169.55.151.1, which corresponds to a physical location in the United States inside a data center operated by SoftLayer Technologies, Inc.

50. On information and belief, every Radiotis-related lender uses the same ACH processor, WLO Payments.

51. On information and belief, WLO Payments charges significantly more for processing ACH transactions than banks and other processors.

52. WLO Payments does this because it is aware that the business they are involved in would otherwise not be granted access to the ACH network.

53. WLO Payments's participation in the enterprise is thus willful, and essential to the lending enterprise's overall ability to operate.

## PLAINTIFF'S TRANSACTION

54. Plaintiff obtained a $400 loan via www.ProTrustGroup.com (nominally Dave Bernard) on January 11, 2025, at a disclosed annual percentage rate of 689.17%.

55. The loan was made for personal purposes and not for business purposes.

56. The principal amount was transferred to Plaintiff's bank account in Indiana via ACH. On information and belief, WLO Payments was responsible for making the transfers.

57. Repayments were to be made from Plaintiff's bank accounts in Indiana via ACH. On information and belief, WLO Payments was responsible for making the transfers.

58. Plaintiff made some payments on the loan, including interest.

59. Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

60. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United*

*States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

61. The excessive interest charges imposed by Defendants were intentional.

**INDIANA REGULATION OF LENDING**

62. The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans.

63. For loans other than supervised loans, Ind. Code § 24-4.5-3-201 provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

64. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
> (a) the total of:
>
> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;
>
> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
>
> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or
>
> (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

65. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq*., but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

66. Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

> (1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.
>
> (2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).
>
> (3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).
>
> (4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

67. The amount of finance charge provided for in <u>Exhibit A</u> is more than double that permitted in Indiana under any provision.

68. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

> (1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .
>
>> (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.
>>
>> (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

(e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

69. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from

an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . . (Emphasis added)

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

70. Plaintiff incorporates paragraphs 1-69.

71. This claim is against all Defendants.

72. Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

73. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

74. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via any of the FNLA websites at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

75. Plaintiff may alter the class definition to conform to developments in the case and

discovery.

76. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

77. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

78. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

79. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

80. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Statutory damages;

ii. Attorney's fees, expenses and costs; and

iii. Such other or further relief as is appropriate.

**COUNT II – RICO**

81. Plaintiff incorporates paragraphs 1-69.

82. This claim is against Radiotis, NCR Financial Services, Inc., Finsana, LLC, WLO Payments, D'Ambrose, and John Does 1-20, who are the RICO "persons."

83. All loans made via the FNLA Websites to Indiana residents are (a) unenforceable

under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate.

84. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

85. Bernard and the FNLA websites are each an enterprise affecting interstate commerce, in that they purport to be located in Canada and make loans to Indiana and other U.S. residents via the Internet.

86. Defendants Radiotis, NCR Financial Services, Inc., Finsana, LLC, WLO Payments, D'Ambrose, and John Does 1-20 are associated with these enterprises.

87. Defendants Radiotis, NCR Financial Services, Inc., Finsana, LLC, WLO Payments, D'Ambrose, and John Does 1-20 conducted or participated in the conduct of the affairs of these enterprises through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

88. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

89. Plaintiff brings this claim on behalf of a class.

90. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via any FNLA website at more than 72% interest (all such loans qualify) (c) which loan was made on or after a date four years prior to the filing of suit.

91. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

92. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether Bernard and the FNLA websites are each an "enterprise."

c. Whether Defendants Radiotis, NCR Financial Services, Inc., Finsana, LLC, WLO Payments, D'Ambrose, and John Does 1-20 are associated with the enterprises.

d. Whether Defendants Radiotis, NCR Financial Services, Inc., Finsana, LLC, WLO Payments, D'Ambrose, and John Does 1-20 conducted or participated in the affairs of these enterprises through a pattern of making and collecting unlawful loans.

93. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

94. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

95. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants Radiotis, NCR Financial Services, Inc., Finsana, LLC, WLO Payments, D'Ambrose, and John Does 1-20 for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

**COUNT III – UNJUST ENRICHMENT**

96. Plaintiff incorporates paragraphs 1-69.

97. This claim is against all Defendants.

98. Defendants obtained money from Plaintiff and the class members through unjust means, and should in equity be required to disgorge such money.

## CLASS ALLEGATIONS

99. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

100. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via any FNLA Website (c) at more than 36% interest (d) on or after a date six years prior to the filing of this action.

101. Plaintiff may alter the class definition to conform to developments in the case and discovery.

102. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

103. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

104. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

105. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

106. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Appropriate damages;

ii. Costs of suit; and

iii. Such other and further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
Dedelman@edcombs.com
Hkolbus@edcombs.com
ahuzyk@edcombs.com

**JURY DEMAND**

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/Daniel A. Edelman*
Daniel A. Edelman

**DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any loan, account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman